AUSA:   Hank Moon            Telephone:   (313) 226-9100
AO 106 (Rev. 04/10)  Application for a Search Warrant   Special Agent:   Geoffrey Whitfield   Telephone:   (313) 965-2323

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Commercial businesses located at 15846 W. Warren<br>Avenue and 15800 W. Warren Avenue, Detroit, MI 48228.<br>More fully described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  19-mc-50186-4

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 | Laundering of monetary instruments |
| 18 U.S.C. § 1957 | Engaging in monetary transactions |

The application is based on these facts:

See attached AFFIDAVIT.

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Geoffrey J Whitfield*
*Applicant's signature*

Geoffrey Whitfield, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   March 11, 2021

*Judge's signature*

City and state:   Detroit, Michigan

David R. Grand        U. S. Magistrate Judge
*Printed name and title*

File No. 2018R00729

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Geoffrey Whitfield, a Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises at 15846 W. Warren Ave. Detroit, MI 48228 ("SUBJECT PREMISES 1") and the premises at 15800 W. Warren Ave. Detroit, MI 48228 ("SUBJECT PREMISES 2"; combined, the "SUBJECT PREMISES") further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 25, 2015. I am assigned to the FBI Detroit Field Office and work a variety of national security and criminal matters. I have investigated federal crimes including racketeering, immigration fraud, money laundering, and other offenses. In addition to training at the FBI Academy, I have attended conferences and seminars on investigating federal national security and criminal matters.

3.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Mohammad el-Ghandour ("GHANDOUR") violated 18 U.S.C. § 1956, laundering of monetary instruments,

1

and 18 U.S.C. § 1957, engaging in monetary transactions in property derived from specified unlawful activity. There is also probable cause to search the SUBJECT PREMISES, described in Attachment A, for evidence of these crimes, as described in Attachment B. Due to the nature of the alleged offenses and the items described in Attachment B, I request authority to search the entire SUBJECT PREMISES, including any garages, sheds, storage rooms, storage lockers, and/or any outbuildings, as well as all vehicles on the SUBJECT PREMISES that are registered to GHANDOUR or his sister, Rania Alsedawi ("ALSEDAWI").

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

*Summary*

5.      Between 2014 and 2019, at least eleven people operated an unlawful pharmacy fraud scheme in the Eastern District of Michigan and elsewhere. *See* First Superseding Indictment, Case No: 19-20821, ECF No. 124, PageID.418. The Superseding Indictment alleges that the eleven defendants submitted more than $46 million in potentially fraudulent claims, and then unlawfully enriched themselves through the submission of these false and fraudulent claims. *Id.* Further, two of these eleven defendants—Hussein Abdallah ("Abdallah") and

2

Mohamad Abou-Khodr[1] ("Abou-Khodr")—are charged with conspiracy to commit health care fraud. *Id*.

6.     As the following paragraphs show, there is probable cause to believe that GHANDOUR helped several of these defendants, including Abdallah and Abou-Khodr, launder millions of dollars of the proceeds of their unlawful pharmacy and health care fraud scheme. In an interview with law enforcement, GHANDOUR admitted that he knew that the defendants opened pharmacies on paper only—that they were never physically opened. GHANDOUR also admitted that he knew that these pharmacies did not have real patients and/or that the pharmacies recycled patients' names at different pharmacies.

7.     Nonetheless, evidence shows that GHANDOUR and his businesses, primarily his businesses at SUBJECT PREMISES 1 and SUBJECT PREMISES 2, accepted millions of dollars from the pharmacy fraud defendants, ostensibly to sell them vehicles. While some of these vehicles stayed in the United States, many others were shipped directly to Lebanon. Abdallah, now cooperating with law enforcement, said that it was common knowledge that if someone gave GHANDOUR money in the United States, GHANDOUR would be able to transfer

---

[1] Abou-Khodr left for Lebanon before he and his codefendants were arrested. Evidence shows that Abou-Khodr knew of the indictment in December 2019, the month the grand jury issued the initial indictment. Abou-Khodr remains in Lebanon, which does not have an extradition treaty with the United States.

that money to Lebanon for a commission. There is probable cause to believe that this scheme was trade-based money laundering: using trade—the purchase and export of vehicles—to disguise the origins of illicit proceeds and end up with "clean" assets in another country, here Lebanon (the government has reason to believe that GHANDOUR and most if not all of the pharmacy fraud defendants are of Lebanese descent and maintain strong ties to Lebanon).

*GHANDOUR's Businesses*

8.      State of Michigan Licensing and Regulatory Affairs ("LARA") records and bank records show that GHANDOUR has owned and operated several different auto sales and service businesses. At nearly all times relevant to the pharmacy/health care fraud scheme, GHANDOUR was the president, treasurer, secretary, and director of Rimo Auto Sales, Inc. located at 15846 West Warren Avenue, Detroit (SUBJECT PREMISES 1).[2] In 2010, GHANDOUR filed a certificate of assumed name creating Luxury Auto Group as a 'doing business as' name for Rimo Auto Sales. GHANDOUR was the sole signer on two different bank accounts for Rimo/Luxury.

---

[2] There was a period from September 8-21, 2017, where GHANDOUR temporarily transferred the company to Nabil El-Hinnawi for an unknown reason.

9.    In April 2017, GHANDOUR established Brietling Financial Auto, Inc. at 7355 Greenfield Road in Detroit, Michigan, and listed himself as the resident agent of the corporation. Bank records show that GHANDOUR was the sole signer on the Brietling bank account.

10.    Officials from the Michigan Secretary of State ("SOS") conducted an inspection review of Rimo/Luxury and Brietling in or around October 2019. The agents cited GHANDOUR for non-compliance with multiple dealer requirements; on November 25, 2019, GHANDOUR surrendered the car dealer licenses associated with both locations: Rimo/Luxury and Brietling.

11.    On June 7, 2019, a change of registered agent for Enterprise Motor Auto Sales Inc., located at 15800 West Warren Avenue in Detroit, Michigan (SUBJECT PREMISES 2), was filed changing the president and registered agent to Rabih Dabaje. SUBJECT PREMISES 1 and SUBJECT PREMISES 2 are located on the same street approximately 167 feet apart. Bank records show that GHANDOUR opened a new account on June 14, 2019, under the name Enterprise Motor Auto Sales, Inc., dba [doing business as] Brietling Financial. GHANDOUR was the sole signer, and the mailing address on the account was SUBJECT PREMISES 2. GHANDOUR later opened a second bank account for Enterprise dba Brietling, located at SUBJECT PREMISES 2, and listed himself and Dabaje as authorized signers.

12.     International Auto Sales, Inc. was incorporated in 1992 by Fayssal Sater, located at SUBJECT PREMISES 2. On December 12, 2019, Sater submitted a change of registered agent form identifying the new registered agent as Rania Alsedawi ("ALSEDAWI"), GHANDOUR's sister. Four days later, ALSEDAWI submitted a certificate of assumed name establishing Luxury Motor Group as a 'doing business as' name for International Auto Sales. Sater notified the State of Michigan that he sold International Auto Sales to ALSEDAWI in 2020. ALSEDAWI completed the Michigan Dealer Corporate Officer Change application for International/Luxury in October 2020: one question asked whether she, the new applicant, was "related by birth or marriage to a currently or previously licensed Michigan vehicle dealer, salvage, vehicle agent, or broker?" ALSEDAWI answered "no," even though her brother GHANDOUR had two previous dealer licenses—one for Luxury Auto Group.

13.     Bank records show that an account was opened for International Auto Sales, Inc., dba Luxury Motor Group, on February 3, 2020. The address on the account was SUBJECT PREMISES 2, and ALSEDAWI and GHANDOUR were listed as the authorized signers.

14.     A Michigan SOS official conducted a general compliance inspection of International Auto Sales, located at SUBJECT PREMISES 2, on October 12, 2020. The inspector did not find any signs for International Auto Sales or hours of

operation. Dabaje, the co-operator of Enterprise Motor Auto Sales dba Brietling Financial, also located at SUBJECT PREMISES 2, was present for the inspection. Dabaje told the SOS inspector that all records for International Auto Sales were actually located at SUBJECT PREMISES 1.

15.     So, the following day, the SOS inspector conducted a general compliance check at SUBJECT PREMISES 1, the former home of Rimo/Luxury that lost its license in 2019. The SOS inspector found the dealer license for International Auto Sales at SUBJECT PREMISES 1, even though the International license listed SUBJECT PREMISES 2 as the business address. The inspector also observed International Auto Sales folders and documents at SUBJECT PREMISES 1, including bank information, shipping labels, and vehicle summary paperwork.

16.     The SOS inspector requested to see International Auto Sales' business records. His review indicated that International Auto Sales was conducting business out of SUBJECT PREMISES 1. Further, his review showed that "Mike" was issuing the temporary registration for these vehicles. I know that "Mike" is a common, Americanized nickname for Mohammad [Mohammad el-Ghandour].

17.     Finally, GHANDOUR organized Luxury Auto Clinic, LLC on March 30, 2016 as a "collision shop." Bank records show two accounts associated with

Luxury Auto Clinic—GHANDOUR was the sole signer on both accounts.

18.     Based upon the above facts, there is probable cause to believe that GHANDOUR continues to be engaged in the auto dealership businesses, despite losing both of his licenses. Based on my training and experience, I believe that he is either in a partnership with his sister or he is using his sister as a nominee because his dealership licenses were revoked by the State of Michigan.

*Pharmacy / Health Care Fraud Defendants spend millions of dollars at GHANDOUR's businesses*

19.     Bank records obtained via grand jury subpoenas show that five of the pharmacy fraud defendants—Abou-Khodr, Abdallah, Daniel Haidar ("Haidar"), Nabil Chehadeh ("Chehadeh"), and Bassem Farhat ("Farhat")—through their sham pharmacies, paid over $2.5 million dollars to GHANDOUR's auto companies between April, 2016 and September, 2018. Much of this money was sent via check, and the memo lines of many of these checks reference various auto models. Here are three (of numerous) examples:

- A check dated October 6, 2016, from New Boston RX LLC was made payable to Luxury Auto Group for $20,000.00. The memo line said "2014 S550 Black," a reference to a Mercedes-Benz S 550 sedan. Abou-Khodr and Abdallah were partners in New Boston RX, and Haidar worked there before opening his own pharmacies.

- A check dated July 28, 2017, from New Boston RX LLC was made payable to Brietling Financial for $15,000. The memo line said "09 Audi QS," a reference to an Audi compact SUV.

- A check dated October 5, 2017, from Med Health Pharmacy, LLC was made payable to Brietling Financial for $34,925. The memo line said "2014 Esclde," a reference to a Cadillac Escalade. Med Health was owned by Chehadeh.

20.     The pharmacy / health care fraud defendants also sent money to GHANDOUR in other ways—including through GHANDOUR's Luxury Auto Clinic collision shop. A review of Luxury Auto's bank records revealed four payments totaling $235,182.73:

- A November 2017 check from Wellgreens Pharmacy, LLC (owned by Haidar) to Luxury Auto Clinic for $39,420.

- An April 2018 check from Med Health Pharmacy LLC (owned by Chehadeh) to Luxury Auto Clinic for $32,280.

- A May 2018 check from Chehadeh to Luxury Auto Clinic for $24,980.

- A June 2018 wire transfer from Wellgreens Pharmacy LLC (owned by Haidar) to Luxury Auto Clinic for $138,502.73.

21.     Based on my training, experience, and common knowledge, the amounts of these payments appear inconsistent with costs associated with auto collision repairs.

*Money Laundering*

22.     There is probable cause to believe that GHANDOUR used his businesses to help launder money for the pharmacy / health care fraud defendants.

Evidence shows that GHANDOUR took approximately $2.5 million dollars from a scheme that he knew was—in his own words—"not right," and either (1) provided the participants with cars here in the U.S.; or (2) shipped cars for the participants directly to Lebanon, as further explained below. The later method is known as trade-based money laundering: using trade—here, the purchase and export of vehicles—to disguise the origins of illicit proceeds and end up with "clean" assets in another country (Lebanon).

23.      When agents spoke with GHANDOUR, he acknowledged that Abdallah, Haidar, Farhat, Abou-Khodr and others were all involved in pharmacy business together and claimed that Abdallah was the main guy in the scheme. GHANDOUR knew that Abou-Khodr, for example, was getting big checks from pharmacies that he was in business with even though the pharmacies were never open. GHANDOUR confirmed that Abou-Khodr opened pharmacies on paper, but never physically opened them. GHANDOUR said that he believed that the pharmacies did not have real patients and/or that they recycled patients' names at different pharmacies. GHANDOUR also spoke with one of Abou-Khodr's employees, who told hem that the group did not "mess" with Medicare; rather, they "messed" with third-party insurance companies.

24.      To his business, GHANDOUR said that Abou-Khodr started out purchasing cars with financing, but later began writing checks for the full amount

of the vehicles. GHANDOUR said that he suspected that something was "not right" with Abou-Khodr's business because GHANDOUR saw runners delivering $80,000 and $100,000 checks to Abou-Khodr while he was meeting with GHANDOUR in his dealership.

25.    GHANDOUR did not tell agents that he himself had opened one of these pharmacies, however. After his arrest, Abdallah agreed to cooperate with law enforcement. He said that GHANDOUR approached Abou-Khodr about opening a pharmacy in 2017 or 2018, but that Abou-Khodr had tuned him down. Afterwards, GHANDOUR opened a pharmacy with a different acquaintance instead. State of Michigan records confirm GHANDOUR opened a pharmacy with Hilal Nahle: GHANDOUR organized Safeway Pharmacy LLC on March 21, 2018 and dissolved on December 30, 2019—less than two weeks after the initial indictment was unsealed in the pharmacy / health care fraud scheme case.

26.    Abdallah also told agents that it was common knowledge that if someone gave GHANDOUR money in the United States, GHANDOUR would be able to transfer that money to Lebanon for a commission. Abdallah further stated that GHANDOUR charged Haider and Abou-Khodr between 8 and 10 percent to move their money. Further, after their arrest Farhat told Abdallah that the government would believe that Farhat was involved in money laundering because of the checks to Luxury Auto.

27.     Abdallah also stated that GHANDOUR was in Lebanon at the time of the interview, and that the rumor was that he had "run away." Abdallah stated that GHANDOUR had a Rolls-Royce and lots of money in Lebanon.

28.     Abdallah also knew that defendants Mohamad Charaf and Haidar purchased vehicles from GHANDOUR but admitted that most of the checks written to GHANDOUR's Luxury Auto Group by Abou-Khodr, Haidar, and Chehadah were not for vehicles—that there were too many checks. He said that Chehadah alone transferred more than $500,000 to GHANDOUR. Abdallah also said that Farhat sometimes gave the members of the pharmacy / health care fraud conspiracy checks without the 'payee' filled in, and that sometimes Abou-Khodr would write GHANDOUR's Luxury Auto Group on to the 'payee' line. Abdallah confirmed that these checks were payment for Abou-Khodr's share of the pharmacy fraud. This caused problems with Farhat, who told Abou-Khodr to stop because "GHANDOUR was too dirty" due to the money laundering rumors.

29.     Abdallah's statements are corroborated by bank records. For example, on September 30, 2017, Pro Med Pharmacy (owned by Farhat) issued a check for $28,200.00. The memo line on the check indicated "M.A.K." (Mohamad Abou-Khodr). The check was endorsed to Brietling Financial Auto and deposited into one of GHANDOUR's bank accounts. Again, on January 26, 2018, Family Drug Pharmacy V (owned by Farhat) issued a check for $20,000. The memo line on the

check indicated "MAK." The check was endorsed to Luxury Auto Group and deposited into one of Ghandour's bank accounts.

30. Haider also spoke with law enforcement after his arrest and admitted to purchasing at least six vehicles from GHANDOUR: two Range Rovers, two Mercedes-Benzs, a BMW, and a Chevy Trailblazer. Haider stated that he shipped one of the Mercedes and the BMW directly to Lebanon. Haider also stated that Chehadah purchased a Range Rover and a Mercedes from GHANDOUR and shipped those directly to Lebanon. Haider stated that Abou-Khodr purchased a lot of vehicles from GHANDOUR and shipped most of them to Lebanon— approximately two vehicles every six months. Finally, Haider stated that Abdallah also purchased a Range Rover and an Escalade from GHANDOUR.

31. Given this information, the FBI served a subpoena on GHANDOUR on December 18, 2019—the same day that law enforcement arrested the pharmacy / health care fraud defendants. The subpoena requested all records related to the sale of vehicles to any of the subjects of the pharmacy / health care fraud case, and listed the names of the defendants Abdallah, Abou-Khodr, Mohamad Charaf, Chehadeh, Farhat, Haidar, Hussein Wazne and Jack Folson, Jr. On January 28, 2020, GHANDOUR provided records responding to the subpoena. According to GHANDOUR's records, he only sold seventeen vehicles to anyone associated with the names listed on the subpoena, for a total amount of $587,271, as shown below:

13

| Date of Purchase | Name | Vehicle | Purchase Price |
|---|---|---|---|
| 3/6/2015 | ZAHRAA ABOU-KHODR | 2008 BMW X5 | 18,137.00 |
| 12/7/2017 | MOHAMAD ABOU-KHODR | 2010 Porsche Cayenne | 218.00 |
| 12/11/2017 | FOLSON FAMILY TRUST | 2012 BMW Station Wagon | 14,725.00 |
| 2/5/2018 | FATME ABOU-KHODR | 2015 Mercedes Benz C300 | 25,664.00 |
| 2/22/2018 | NABIHA HUSSEIN FAWAZ | 2013 Range Rover HSE | 58,000.00 |
| 3/9/2018 | MOHAMAD ABOU-KHODR | 2016 Mercedes Benz GLE | 66,103.00 |
| 3/16/2018 | MICHAEL HAIDAR | 2011 BMW X5 | 14,242.40 |
| 4/5/2018 | MICHAEL HAIDAR | 2012 BMW X5 | 11,901.70 |
| 5/3/2018 | NABIL CHEHADEH | 2015 Range Rover SVR | 63,000.00 |
| 5/3/2018 | ABED YEHIA | 2014 Range Rover Sport | 48,000.00 |
| 5/3/2018 | MOHAMAD ABOU-KHODR | 2013 Range Rover HSE | 55,000.00 |
| 5/3/2018 | ZEINAB ABOU-KHODR | 2014 Range Rover Sport | 56,000.00 |
| 5/14/2018 | HANI B. HAIDAR-AHMAD | 2014 Mercedez Benz CLA 250 | 17,574.70 |
| 5/15/2018 | ZEINAB ABOU-KHODR | 2015 Mercedes Benz S550 | 70,193.70 |
| 6/14/2018 | TAREK MROUEH | 2014 Range Rover Sport | 53,000.00 |
| 10/18/2018 | HASSAN ABOU-KHODR | 2014 Ford Escape | 8,802.70 |
| 9/18/2019 | KASSEM ABOU-KHODR | 2013 Chevy Malibu | 6,709.40 |
| TOTAL | | | 587,271.60 |

32.    A review of the records GHANDOUR provided shows several

significant inconsistencies, including:

- The total purchase price of $587,271.60 is almost $2,000,000 short of the money that law enforcement knows that the pharmacy / health care fraud defendants sent to GHANDOUR and his businesses.

- Of the checks listed in paragraph 16 from some of the pharmacy / health care fraud defendants to GHANDOUR ostensibly for vehicles, with make/model information on the memo line, *none* of those checks match the information provided by GHANDOUR (looking by vehicle, date, or amount). None of the checks listed in paragraph 17 to GHANDOUR's Luxury Auto Clinic appear either.

- Haider admitted to purchasing six vehicles from GHANDOUR, but only three are included in the information GHANDOUR provided. There are also no vehicles listed as sold to Charaf or Abdallah, contrary to what Abdallah and Haider told law enforcement. The list also does not show two vehicles sold to Abou-Khodr every six months.

## THE SUBJECT PREMISES

33.    There is probable cause to believe that GHANDOUR keeps records

for his various auto-related businesses at SUBJECT PREMISES 1 and SUBJECT

PREMISES 2 (collectively, the SUBJECT PREMISES). First, Rimo/Luxury was

formally registered at and operated out of SUBJECT PREMISES 1. Second, during

the October 2020 SOS inspection, Dabaje told the SOS inspector that all records

for International Auto Sales, which was supposed to be operating out of SUBJECT

PREMISES 2, were actually located at SUBJECT PREMISES 1. Third, during a

follow-on inspection at SUBJECT PREMISES 1, the SOS inspector found

International Auto Sales' records, paperwork, and dealer license at SUBJECT

PREMISES 1. Fourth, GHANDOUR is still officially associated with Enterprise

Motor Auto Sales, Inc., dba [doing business as] Brietling Financial, which is

located at SUBJECT PREMISES 2.

34.    Law enforcement has maintained sporadic surveillance on the

SUBJECT PREMISES from December 2019 to the present. As of March 2021, the

auto sales businesses are still operating out of SUBJECT PREMISES 1 and

SUBJECT PREMISES 2. Most recently, law enforcement physical surveillance

conducted on March 10, 2021 identified both locations operating with inventory on

both parking lots and security gates open to the public.

35.    From my training, experience, and discussions with Michigan SOS officials, I know that dealers are required to keep records for every vehicles sold, including the bill of sale, a signed vehicle title, and an odometer statement. Dealers must also maintain either a "police book," a hardcover, bound volume which contains a complete bought-and-sold record for each vehicle handled by the dealer, or a "washout system," and electronic or paper record system of all vehicles purchased and sold.

## COMPUTERS, ELECTRONIC STORAGE, and FORENSIC ANALYSIS

36.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

37.    *Probable cause.* I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a

storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, including financial information, vehicle sales records, and vehicle shipping records, I am aware that computer equipment was used to generate, store, and print documents used in the money laundering scheme. There is reason to believe that there is a computer system currently located on the SUBJECT PREMISES.

38.    *Forensic evidence.* As further described in Attachment B, this

application seeks permission to locate not only computer files that might serve as

direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed

or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the

computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

39.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information

for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

40. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

41. International Auto Sale, Inc. and Enterprise Motor Auto Sales ("the Companies") are functioning companies that may conduct legitimate business. The seizure of the Companies' computers may limit the Companies' ability to conduct

21

its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Companies' so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Companies' legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## **CONCLUSION**

36.     I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and seize the items described in Attachment B.

37.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure

may seriously jeopardize that investigation.

Respectfully submitted,

_Geoffrey J Whitfield_

Geoffrey Whitfield, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.

David R. Grand
United States Magistrate Judge

Dated: March 11, 2021

23

## <u>ATTACHMENT A</u>

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

## SUBJECT PREMISES 1

The property to be searched is a commercial business located at 15846 West Warren Avenue, Detroit, MI 48228. The commercial business is described as a single story commercial building, constructed of brown and white colored brick with a red awning above the entrance to the building. The business property is enclosed by a metal fence and has numerous signs labeled "Luxury Motor Group" and "Luxury Auto Group." This includes any storage buildings associated with the business, vehicles for sale presently at this location associated with business, or vehicles registered to GHANDOUR or ALSEDAWI on the curtilage of the property.



## ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

## SUBJECT PREMISES 2

The property to be searched is commercial business located at 15800 W. Warren Avenue, Detroit, MI 48228. The commercial business is described as a single-story commercial building, constructed of gray-colored brick with a blue awning above the entrance to the building. The business property is enclosed by a metal fence and has numerous signs labeled "Enterprise Financial." This includes any storage buildings associated with the business, vehicles for sale presently at this location associated with business, or vehicles registered to GHANDOUR or ALSEDAWI on the curtilage of the property.



## <u>ATTACHMENT B</u>

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

1.     All items that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956, laundering of monetary instruments, including but not limited to:

a.  Records and information related to the purchase and sale of vehicles including titles, bills of sale (RD-108), odometer statements, invoices, financing agreements, checks, money orders, wire transfers and sales tax records.

b.  Records and information relating to the shipment of vehicles including bills of lading, export declarations, customs forms, and shipping invoices.

c.  Records and information relating communication between or involving the persons named in this warrant including letters, phone messages, voice mail, e-mail, WhatsApp, text messages or other electronic communications.

d.  Records and information relating to financial accounts, both domestic and foreign bank accounts, including bank statements, electronic fund transfer requests or receipts, checks, debit cards, electronic banking applications, account usernames and passwords.

e. Records and information relating to the identity or location of the suspects such as contact lists, e-mail communications, airline or hotel reservations, etc.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

b. Evidence of software (or the lack thereof) that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user.

3

d.  Evidence indicating the computer user's state of mind as it relates to the crime under investigation.

e.  Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence.

f.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER.

g.  Evidence of the times the COMPUTER was used.

h.  Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

i.  Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER.

j.  Records of or information about Internet Protocol addresses used by the COMPUTER.

k.  Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

l. Contextual information necessary to understand the evidence described in this attachment.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AUSA:   Hank Moon       Telephone:  (313) 226-9100

AO 93  (Rev. 11/13) Search and Seizure Warrant       Special Agent:       Geoffrey Whitfield       Telephone:  (313) 965-2323

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  19-mc-50186-4
Commercial businesses located at 15846 W. Warren )
Avenue and 15800 W. Warren Avenue, Detroit, MI 48228. )
More fully described in Attachment A )

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   March 25, 2021 _____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  March 11, 2021    5:27 pm

Judge's signature

City and state:   Detroit, Michigan       David R. Grand      U. S. Magistrate Judge
*Printed name and title*

File No.  2018R00729

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>19-mc-50186-4 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*